IN THE SUPREME COURT OF THE STATE OF DELAWARE

CHAON CALHOUN, § 
        § No. 33, 2020
  Defendant Below, § 
  Appellant, § Court Below—Superior Court
        § of the State of Delaware
  v. § 
        § Cr. ID No. 1804000397 (N)
STATE OF DELAWARE, § 
        § 
  Plaintiff Below, § 
  Appellee. § 

Submitted: August 14, 2020
Decided: October 7, 2020

Before **SEITZ**, Chief Justice; **TRAYNOR** and **MONTGOMERY-REEVES**, Justices.

## ORDER

After consideration of the appellant's Supreme Court Rule 26(c) brief, the State's response, and the record on appeal, it appears to the Court that:

(1) On September 20, 2019, after a six-day bench trial, the Superior Court found the appellant, Chaon Calhoun, guilty, but mentally ill, of first-degree murder, attempted first-degree murder, two counts of first-degree assault, four counts of possession of a deadly weapon during the commission of a felony, and possession of a deadly weapon by a person prohibited. The Superior Court sentenced Calhoun to two terms of life imprisonment, plus a term of years. This is Calhoun's direct appeal.

(2)     The evidence presented at trial established that, on Easter Sunday April 1, 2018, Connie Saunders and her eighteen-month old child ("the Child") were living with the Child's paternal grandmother, Wanda Berry.  Calhoun, who was Berry's son, did not live with Berry, but he was staying with her that weekend.  According to Berry, Calhoun was acting strangely, claiming his girlfriend was trying to kill him and not eating.  Berry was trying to get Calhoun professional help.

(3)     That evening Saunders was watching movies in her bedroom with a friend, Andrew Moore, and the Child.  Calhoun, who was not friendly with Saunders, unexpectedly came into Saunders's bedroom.  He started talking about keeping the Child safe and offered to give Saunders a knife for her protection.  After Calhoun left the room to find a knife, Moore expressed fear about Calhoun's behavior and closed and locked the bedroom door.

(4)     When Calhoun came back with a knife and realized the door was locked, he started to break open the door.  Moore unsuccessfully tried to keep the door closed.  Calhoun offered the knife to Saunders, who told him to leave it in the hallway and she would get it.  Calhoun told Saunders she was all right, but Moore had to die.  Calhoun then began stabbing Moore.  He also stabbed Saunders and the Child.  Saunders grabbed the Child and ran out another door in the bedroom that led outside of the residence.  She flagged down a car to take her and the Child to Wilmington Hospital.

(5) Berry was outside of the residence when the attack began. When she heard Saunders yelling, she ran back inside. Berry saw Calhoun attacking Moore and told him to stop. At some point, Calhoun stabbed Berry in the head. Moore wrestled the knife away from Calhoun and slid it under a couch. The police later collected the knife, which had an approximately four-inch blade and a broken tip.

(6) Multiple neighbors called 911. When the police arrived, they found Berry on the front porch, covered in blood and stating she had been stabbed by her son, who was inside. Moore was lying and moaning on a rug near the residence entrance.

(7) The police found Calhoun in the living room. According to one police officer, Calhoun was babbling, appeared to be under the influence, and asked the police to shoot him. Another police officer said Calhoun mentioned people teleporting around the room. This police officer was also present at St. Francis Hospital where Calhoun received medical treatment for a laceration on his hand. According to that officer, Calhoun seemed intoxicated and said that everyone was dead because PCP[1] was draining out of his body, that he killed his own family for PCP, and that he should get the death penalty. Another police officer who was also present at the hospital testified that Calhoun said he killed his brother, his niece, and

---

[1] PCP is short for a phenycyclidine.

3

his mother and that PCP took over his body. Calhoun kept asking if he had done something bad and said that he wanted to die.

(8) Moore was taken to Christiana Hospital, where he died early on April 2, 2018. A doctor with the Medical Examiner Unit of the Division of Forensic Science ("DFS") testified that Moore died as a result of stab wounds.

(9) The emergency room doctor who treated Saunders testified that she had a superficial abrasion on her forehead and lacerations on her hand. The doctor treated Berry for a stab wound to the top of her head. Berry was discharged shortly thereafter. Not long after she was discharged, Berry returned to Wilmington Hospital complaining of a headache. A CAT scan revealed a small piece of metal in her head.

(10) The emergency room doctor also assisted with the treatment of the Child, who was not breathing well when brought to the hospital. The Child was transferred to Alfred I. duPont Hospital for Children where she underwent surgery for life-threatening injuries. These injuries included a puncture wound to her scalp that fractured her skull and punctured her brain. The Child was discharged from the hospital after nine days, the long-term effects of her brain injuries unknown.

(11) After obtaining a search warrant, the police collected blood and DNA samples from Calhoun for testing. The DFS Chief Forensic Toxicologist testified that the toxicology report showed the presence of PCP in Calhoun's blood (19

4

nanograms per milliliter within a reporting range of 10 to 500 nanograms per milliliter). She could not opine when Calhoun had ingested PCP. She also testified that side effects of PCP can include disorientation, loss of coordination, hallucinations, and violent behavior. A drug screen performed by the Department of Correction when Calhoun was booked was negative for all substances.

(12) The parties stipulated that Calhoun was a person prohibited. At the conclusion of the State's case, Calhoun moved for a judgment of acquittal on the attempted first-degree murder charges involving the Child and Berry and asked the Superior Court to downgrade those charges to first-degree assault. The Superior Court denied the motion, but indicated that lesser-included offenses might be appropriate.

(13) In support of his not guilty by reason of insanity defense, Calhoun presented the expert of testimony of Dr. Robert Thompson, a clinical and forensic psychologist. Dr. Thompson testified that Calhoun was diagnosed with Attention Deficit Hyperactivity Disorder as a child, but that he had no history of psychiatric treatment as an adult. According to Dr. Thompson, Calhoun suffered significant trauma from beatings he suffered as a child and the death of a cousin when he was twenty-years-old. Calhoun told Dr. Thompson that shortly before his cousin's death voices warned him that one of them was going to die. By that time, Calhoun already had concerns about people being able to read his mind. While incarcerated, Calhoun

5

reported auditory hallucinations, a belief that he had telepathy, and a persistent feeling that someone was following him. The Department of Correction first diagnosed Calhoun with PCP psychosis, then bipolar disorder, and then schizoaffective disorder.

(14) Dr. Thompson diagnosed Calhoun with unspecified schizophrenia spectrum and other psychotic disorder, a history of PCP-induced psychotic disorder, PCP use disorder, cannabis disorder, asthma, and seasonal allergies. In discussing Calhoun's fifteen-year history of PCP use, Dr. Thompson noted that the PCP use could have masked Calhoun's mental issues. Dr. Thompson opined that Calhoun, as a result of his serious mental disorder, lacked the substantial capacity to appreciate the wrongfulness of his conduct at the time of the crimes. He also opined, in response to an inquiry from the Superior Court judge, that Calhoun suffered from a mental illness that sufficiently disturbed his thinking, feeling, or behavior, or that left him with insufficient willpower to choose whether to commit or refrain from committing the crimes.

(15) Dr. Thompson did not believe Calhoun was voluntarily under the influence of PCP or suffering PCP-induced psychosis at the time of his crimes because Calhoun told him he last used PCP five days before the attacks and Berry said he had not used PCP while at her residence. Dr. Thompson acknowledged there were other reports that Calhoun had used PCP closer to the attacks. Dr. Thompson

6

also did not believe that the attacks were the result of PCP-induced psychosis because Calhoun continued to have a psychotic disorder while imprisoned, long after he was exposed to PCP. Dr. Thompson did not believe Calhoun was malingering or faking his symptoms. Dr. Thompson's conclusions were not changed by Calhoun's statements at the hospital because he believed a psychotic person could express remorse.

(16) The State called Dr. Stephen Mechanick, a clinical and forensic psychiatrist, to testify in rebuttal. Dr. Mechanick testified that there was no evidence Calhoun had a significant mental health history before the crimes. Dr. Mechanick did find Calhoun had a significant history of substance abuse, including marijuana, alcohol, and PCP. Dr. Mechanick did not believe that Calhoun suffered from bipolar disorder, schizophrenia, or schizoaffective disorder. Dr. Mechanick believed that Calhoun's general functioning (he had a longtime girlfriend and was able, depending on his PCP use, to maintain employment) and ability to ignore the voices he claimed to hear for years was not normal for someone who suffered from schizophrenia. According to Dr. Mechanick, Calhoun's post-attack claims that he heard voices in his head suggested malingering to avoid criminal responsibility. Dr. Mechanick diagnosed Calhoun with PCP use disorder, alcohol use disorder, and cannabinoid use disorder. He opined that Calhoun's behavior at the time of the crimes was due to PCP intoxication. He testified that the side effects of PCP use can include

7

paranoia and aggression. Dr. Mechanick believed that Calhoun's post-attack statements at the hospital reflected an appreciation for the wrongfulness of his actions.

(17) In a general verdict, the Superior Court found Calhoun guilty, but mentally ill of first-degree murder (Moore), attempted first-degree murder (the Child), first-degree assault as lesser included offense of attempted first-degree murder (Berry), first-degree assault (Saunders), four counts of possession of a deadly weapon during the commission of a felony, and possession of a deadly weapon by a person prohibited.

(18) On appeal, Calhoun's appellate counsel ("Counsel") filed a brief and a motion to withdraw under Supreme Court Rule 26(c). Counsel asserts that, based upon a complete and careful examination of the record, there are no arguably appealable issues. Counsel informed Calhoun of the provisions of Rule 26(c) and provided Calhoun with a copy of the motion to withdraw and the accompanying brief.

(19) Counsel also informed Calhoun of his right to identify any points he wished this Court to consider on appeal. Calhoun has raised points for this Court's consideration. The State has responded to the Rule 26(c) brief and has moved to affirm the Superior Court's judgment.

(20) When reviewing a motion to withdraw and an accompanying brief under Rule 26(c), this Court must (i) be satisfied that defense counsel has made a conscientious examination of the record and the law for arguable claims and (ii) conduct its own review of the record and determine whether the appeal is so totally devoid of at least arguably appealable issues that it can be decided without an adversary presentation.[2] Calhoun's arguments on appeal may be summarized as follows: (i) the Superior Court deprived him of his right to a competency hearing; (ii) the Superior Court failed to establish that he understood his waiver of his right to a jury trial; and (iii) the Superior Court judge was biased in favor of the State's expert because he had worked with that expert when he was a prosecutor.

(21) We review Calhoun's claim that the Superior Court erred in failing to hold a competency hearing for plain error.[3] The conviction of a legally incompetent person violates due process.[4] A trial court must inquire *sua sponte* into a defendant's competence to stand trial when there is a reason to doubt the defendant's competence.[5] "The test of competency to stand trial is whether or not the defendant has sufficient present ability to consult with his lawyer rationally and whether he has

---

[2] *Penson v. Ohio*, 488 U.S. 75, 83 (1988); *Leacock v. State*, 690 A.2d 926, 927-28 (Del. 1996).

[3] *Kostyshyn v. State*, 51 A.3d 416, 419 (Del. 2012) (citing Supreme Court Rule 8).

[4] *See Drope v. Missouri*, 420 U.S. 162, 171-72 (1975); *Pate v. Robinson*, 383 U.S. 375, 379 (Del. 1966). *See also Kostyshyn*, 51 A.3d at 420 ("The Due Process clause protects an incompetent person from criminal conviction.").

[5] *See Godinez v. Moran*, 509 U.S. 389, 401 n.13 (1993); *Kostyshyn*, 51 A.3d at 420.

a rational as well as a factual understanding of the proceedings against him."[6] "[A] defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient."[7]

(22) The record in this case does not support Calhoun's contention that the Superior Court was required to hold a hearing on his competence. At the August 14, 2019 pretrial conference, Calhoun's trial counsel informed the Superior Court that Calhoun was rejecting the State's outstanding plea offer. In reviewing the discussions that led to Calhoun's rejection of the plea offer, trial counsel stated that based on the thirty or so times she had spoken with him, including that morning, she did not believe that there were presently any competency issues. She mentioned that Calhoun was taking Haldol for his mental health issues and Congentin to combat the side effects of Haldol (joint pain). She also raised that Calhoun wanted a bench trial, rather than a jury trial.

(23) After confirming that Calhoun heard his trial counsel's comments, the Superior Court reviewed with Calhoun the medications he was taking, the charges and sentences he faced, the outstanding plea offer, and his desire to reject the plea

---

[6] *Williams v. State*, 378 A.2d 117, 119-20 (Del. 1977) (citations omitted).
[7] *Drope*, 420 U.S. at 181.

10

offer and proceed to trial. Calhoun stated that he did not believe the medications helped him understand things better, but he also stated that he would not understand things better without the medications. After Calhoun's trial counsel said he told her earlier that day that he believed the medications helped him, but he needed a higher dose, Calhoun confirmed that he believed his medications should be adjusted. The Superior Court asked trial counsel if any mental health experts had opined on Calhoun's competency, and trial counsel stated that Dr. Thompson had not found any competency issues. Calhoun confirmed that he understood the risks of proceeding to trial and the benefits of the plea offer and that he had sufficient time to discuss the plea offer with his counsel. The Superior Court accepted Calhoun's rejection of the plea offer. As to Calhoun's possible waiver of his right to a jury trial, the Superior Court directed the parties to return in two days.

(24) On August 16, 2019, the Superior Court held a hearing on Calhoun's waiver of his right to a jury trial. The Superior Court judge told Calhoun that if there was anything he did not understand he could consult with his trial counsel or ask the judge to explain. During the colloquy, Calhoun confirmed that he was taking Haldol for his mental health issues and some medications to help him tolerate the Haldol. Calhoun said he believed the medications helped him communicate with his counsel and understand the proceedings. Calhoun understood that mental health professionals had found him competent, even though he said he did not understand

11

how they reached that conclusion. He also understood his right to a jury trial, his right to participate in the selection of jurors, and that waiver would result in the judge deciding his guilt or innocence. Calhoun initially said he could not recall whether he discussed the pros and cons of a jury trial versus a bench trial with his counsel, but then said he understood the pros and cons from his discussions with counsel. Calhoun expressed uncertainty as to how to answer the judge's question concerning whether he needed to have more discussions with his counsel about the waiver of his right to a jury trial but emphasized that he wanted to have a trial by a judge.

(25) After Calhoun and his trial counsel conferred, trial counsel explained that Calhoun was wondering why the judge was asking so many questions. The judge explained that Calhoun's right to a jury trial was very important, the judge had to make sure that Calhoun was knowingly and intelligently waiving that right, and the decision to waive was solely Calhoun's to make. Calhoun said he understood.

(26) Calhoun's trial counsel then reviewed the discussions leading to Calhoun's waiver of his right to a jury trial and her belief, based on her interactions with him, that he knowingly wished to waive that right. In response to the judge's inquiry regarding whether anything had come to her attention that suggested Calhoun was not competent to waive his right to a jury trial, trial counsel said she had no doubts about his competency. The prosecutor also stated that she was not aware of anything to suggest that Calhoun was not competent to waive his right to a

12

jury trial and that the State was willing to waive a jury trial. Based on what was discussed at the August 14, 2019 hearing and the colloquy with Calhoun, the Superior Court found that Calhoun's waiver was knowingly, intelligent, and voluntary and approved the waiver. The written stipulation of waiver was signed by all of the parties, including Calhoun, and docketed.

(27) A week later Calhoun's counsel informed the Superior Court that Calhoun had been placed on Psychiatric Close Observation status, which meant that she and Dr. Thompson could not see him. To determine how this could affect the schedule, the Superior Court directed the Department of Correction to provide an update, which it did. Calhoun's counsel notified the court that she did not believe it would be necessary to change the schedule as Dr. Thompson would be seeing Calhoun soon, she saw Calhoun the previous day, and Calhoun said he was feeling much better.

(28) On the first day of trial, the Superior Court asked Calhoun's trial counsel if, in light of recent changes to Calhoun's treatment, there was anything that led her to believe he was not competent to proceed with trial. Trial counsel reported that Dr. Thompson had seen Calhoun within the past week and found no competency issues. Counsel also shared her impression that Calhoun was doing better on the modified medication. During trial, Dr. Thompson testified that he believed Calhoun was mentally ill but competent to proceed. Dr. Thompson was concerned about

13

competency in a case like Calhoun's, but he never determined that Calhoun was no longer competent. Dr. Thompson's expert report, which was admitted into evidence at trial, opined that Calhoun was competent. The report stated, among other things, that Calhoun understood the seriousness of the charges against him, understood the possible punishments he faced if found guilty, was able to describe the roles and functions of courtroom personnel, understood basic information about courtroom procedures, and knew he could testify at trial.

(29) This record does not reflect any basis for the Superior Court to reasonably doubt Calhoun's competency at any time during the proceedings. It is clear that the Superior Court was attuned to the competency issue. In response to the Superior Court's repeated inquiries regarding Calhoun's competency, Calhoun's counsel told the Superior Court that she and Dr. Thompson believed Calhoun was competent. Dr. Thompson's expert report and testimony were consistent with counsel's representations to the Superior Court.

(30) The fact that Calhoun said he did not understand how Dr. Thompson concluded he was competent does not raise a reason to doubt Calhoun's competency. Calhoun's behavior and demeanor in the Superior Court judge's presence was rational. He did not act irrationally or disrupt the court proceedings. He assisted his counsel with his defense. In the absence of any reason to doubt Calhoun's competency, the Superior Court was not required to hold a competency hearing.

(31)     As set forth above, the Superior Court was not required to hold a competency hearing before Calhoun waived his right to a jury trial.  To the extent that Calhoun claims his waiver was not intelligent and voluntary, that claim is without merit.  The decision "to accept or deny a defendant's waiver of a trial by jury is within the trial judge's discretion."[8]

(32)   A criminal defendant may waive his constitutional right to a trial by jury.[9]  "For a defendant to waive his or her right to a jury trial under Superior Court Criminal Rule 23(a), the defendant must make an 'intelligent and voluntary waiver in writing.'"[10]  The trial court should also conduct a colloquy with the defendant to ensure that the defendant understands the nature of a jury trial and the right that he is waiving.[11]

(33)   The Superior Court's colloquy with Calhoun, his counsel, and the prosecutor conformed with the process recommended by this Court in *Davis*.[12] Calhoun also executed a written waiver as required by Rule 23(a).  The Superior Court did not err in finding that Calhoun intelligently and voluntarily waived his right to a jury trial.

---

[8] *Davis v. State*, 809 A.2d 565, 572 (Del. 2002).
[9] *Adams v. United States ex rel. McCann*, 317 U.S. 269, 278 (1942); *Deshields v. State*, 706 A.2d 502, 508 (Del. 1998).
[10] *Davis*, 809 A.2d at 568 (quoting *Polk v. State*, 567 A.2d 1290, 1294 (Del. 1989)).
[11] *Id.* at 571.
[12] *Id.* at 572 (attaching best practices used in federal court for jury trial waiver colloquy).

15

(34)   Finally, Calhoun argues that the Superior Court judge was biased in favor of Dr. Mechanick because Dr. Mechanick was an expert witness in a case that the judge handled when he was a prosecutor.  Calhoun did not raise this claim below so we review for plain error.[13]   There is no plain error here.  In arguing that the verdict shows the Superior Court judge was biased in favor of Dr. Mechanick, Calhoun ignores that the judge found him guilty, but mentally ill, which means the judge did not accept Dr. Mechanick's opinion that it was likely Calhoun feigned mental health problems or that Calhoun's mental state at the time of the crimes was caused by his voluntary PCP intoxication.[14]   Calhoun also fails to cite any authority that a judge must recuse himself when an expert he worked with before becoming a judge testifies in a proceeding before the judge.  This Court has recognized that "[p]revious contact between the judge and a party, in the same or a different judicial proceeding, does not require automatic disqualification.[15]

---

[13] Supr. Ct. R. 8.

[14] To find a defendant guilty, but mentally ill, the finder of fact must determine that the defendant, at the time of the crime, "suffered from a mental illness or serious mental disorder which substantially disturbed such person's thinking, feeling or behavior and/or that such mental illness or serious mental disorder left such person with insufficient willpower to choose whether the person would do the act or refrain from doing it, although physically capable…."  11 *Del. C.* § 401(b).  Under 11 *Del. C.* § 401(c), it is not a defense "if the alleged insanity or mental illness was proximately caused by the voluntary ingestion, inhalation or injection of intoxicating liquor, any drug or other mentally debilitating substance, or any combination thereof, unless such substance was prescribed for the defendant by a licensed health-care practitioner and was used in accordance with the directions of such prescription."  Voluntary intoxication is not a defense to any criminal charge.  11 *Del. C.* § 421.

[15] *Los v. Los*, 595 A.2d 381, 384 (Del. 1991).

(35) This Court has reviewed the record carefully and has concluded that Calhoun's appeal is wholly without merit and devoid of any arguably appealable issue. We also are satisfied that Counsel has made a conscientious effort to examine the record and the law and has properly determined that Calhoun could not raise a meritorious claim in this appeal.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is AFFIRMED. The motion to withdraw is moot.

BY THE COURT:

*/s/ Tamika R. Montgomery-Reeves*
Justice